IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CALVIN ROBERTS               :

                          :

    v.                     :   Civil Action No. DKC 10-3359

                          :

OFFICE OF THE SHERIFF FOR
CHARLES COUNTY, et al.       :

**MEMORANDUM OPINION**

Presently pending and ready for review in this employment discrimination case is the motion to dismiss Plaintiff's amended complaint filed by Defendants, Office of the Sheriff for Charles County, Sheriff Rex W. Coffey, Sergeant Vincent Weaver, and Lieutenant Brian Herlihy (ECF No. 8), and the motion for leave to file a supplement to the motion to dismiss by Defendants (ECF No. 18). The issues have been fully briefed, and the court now rules, no hearing deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted in part and denied in part, and the motion for leave to file a supplement to the motion to dismiss will be denied.

**I.   Background**

**A.   Factual Background**

Plaintiff alleges the following facts. Plaintiff Calvin Roberts, an African-American male, is a resident of Maryland. Since 1994, he has worked for the Office of the Sheriff for Charles County ("the OSCC"). In August 1998, Roberts attended

the Prince George's County Police Canine Basic Handler Course and subsequently joined the K-9 Unit of the OSCC. In October 1999, he was assigned his first dog. A couple of months later, Roberts was assigned a new dog. With this new dog, he attended sixteen weeks of training with the Prince George's County Police Department. The training took an extended period of time to complete, in part, due to inclement weather. Sergeant Vincent Weaver, Roberts's supervisor, complained about the length of time that Roberts was in the training.

According to Roberts, this was not the only time that Weaver criticized him. As Roberts continued on with the OSCC, Weaver "routinely" criticized Roberts's performance. (ECF No. 8 ¶ 13).[1] Moreover, Weaver sometimes did so publicly.[2] If Weaver was not criticizing Roberts, he was otherwise silent about Roberts's performance, despite Roberts's accomplishments as a K-

---

[1] For example, in 2005, Roberts followed proper procedure in using his canine to apprehend a fleeing suspect, but Weaver criticized Roberts for his "poor judgment" in not using pepper spray or a taser. (*Id.* ¶ 14). Weaver "never criticized similarly-situated white K-9 officers for similar behavior." (*Id.*).

[2] On May 1, 2007, for instance, Weaver told several other officers that Roberts was not intelligent, and Weaver questioned whether Roberts could handle his canine. Weaver did not speak the same way about Roberts's "similarly-situated white co-workers." (*Id.* ¶ 18).

9 Unit officer.[3]  In at least one instance, in June 2006, Weaver purposefully ignored Roberts's qualifications when he selected two Caucasian officers in the K-9 Unit who were more junior and less experienced than Roberts to become assistant trainers. (*Id.* ¶ 16).

### 1. Roberts's Training Opportunities

In January 2007, Roberts applied to a training program at the Southern Maryland Criminal Justice Academy ("SMCJA"). Roberts wanted to take this class "to augment his education and become an asset to the agency."  (*Id.* ¶ 17).  Weaver denied Roberts's application but allowed "other similarly-situated white employees . . . to attend the training."  (*Id.*).  In August 2008, Roberts again applied to take the SMCJA training course but was denied this opportunity.  Again, "similarly situated white co-workers were permitted to take the training." (*Id.* ¶ 21).

Roberts made other requests for training, which were either denied or ignored.  In December 2008, Roberts's request to attend a canine training at the Blackwater Tactical School was denied, though Lieutenant Brian Herlihy, one of Roberts's supervisors, was allowed to attend.  In April 2009, Roberts made

---

[3] For example, from 2000 to 2002, Roberts received four commendations, but Weaver "never recognized these achievements." (*Id.*).

a request to take a "deep hide training" course, which was necessary to pass a certain certification test.   Weaver, however, never followed-up with Roberts's request.

Despite these roadblocks, Roberts did participate in a few training opportunities, with varying degrees of success.   In January 2009, Roberts attended the North American Dog Association for Patrol Training ("NADAP Training"), where he received a certification.[4]   In December 2009, Roberts attended a St. Mary's County training, which Weaver happened also to attend.   Roberts failed to complete the training, however, because he "was under stress due to the fact that Weaver was involved in the same course" and because "the canine did not possess the character traits necessary to complete the training course." (*Id.* ¶ 28(*l*)).

### 2. Roberts's Suspension

In the middle of Roberts's attempts to attend various training programs, an incident occurred in January 2008 between Roberts, his canine, and an inmate, and Roberts was charged with assault and excessive use of force as a result.   In April 2008, he was disciplined for his actions via a suspension without pay and mandatory enrollment in an anger management course.   At some point, a Caucasian correctional officer named Matthew Irby was

---

[4] Roberts complains that Weaver "never commended Roberts for this accomplishment." (*Id.* ¶ 24).

also accused of excessive force but was not suspended or disciplined.[5]

### 3.   Roberts's Complaints to Coffey and the EEOC

On September 24, 2009, Roberts met with Sheriff Rex W. Coffey.  He informed Coffey of the various difficulties he was experiencing in his job, including the alleged racial discrimination and harassment he suffered under Weaver's supervision.  On October 7, 2009, Coffey told Roberts that an internal fact-finding investigation would be conducted.  After Roberts's meetings with Coffey, a variety of incidents occurred that Roberts alleges took place in retaliation for his complaints.  For example, on October 14, 2009, Weaver did not issue a press release regarding the recent death of Roberts's canine partner, and on October 22, 2009, Roberts was assigned to patrol duty, which altered his day-to-day duties.

Then, in November 2009, Roberts filed an EEO complaint regarding Weaver's supervision (the "November 2009 complaint"). On November 11, 2009, Coffey removed Weaver as Roberts's supervisor.  Weaver was not otherwise disciplined, however. Soon after Roberts filed his EEO complaint, several more incidents allegedly occurred in retaliation for his reporting to

---

[5] The amended complaint does not specify whether the charge against Irby was related to the events giving rise to the charges against Roberts.

the EEO.   On December 3, 2009, Herlihy sent a "Hurt Feelings Report" to Roberts to mock him.   On December 16, 2009, Herlihy denied a request for leave for Roberts.   On February 18, 2010, Herlihy denied a request by Roberts to work off-duty security, though he had granted earlier requests.   And on March 16, 2010, Coffey and Herlihy transferred Roberts to a tactical response unit while he was waiting for a new canine assignment, which he received in September of that year.

Throughout this time period, Roberts was subjected to other "ongoing harassment and reprisal (based on his race and protected activity)." (*Id.* ¶ 28).   For example, he was assigned various canines, some of which did not meet the K-9 Unit's standards.   Roberts faults Defendants for these unsuccessful assignments.   Roberts further faults Weaver for failing to provide adequate support for the canine assignments, such as neglecting to schedule veterinary visits.

B.   **Procedural Background**

At some point, Roberts filed a "Complaint of Discrimination" with the Maryland Human Relations Commission. This complaint was cross-filed with the EEOC.[6]   On October 27, 2010, the EEOC issued a Right-to-Sue notice to Roberts.   On

---

[6] The amended complaint does not state the date of this EEO complaint, which is presumably the same as the November 2009 complaint.

January 24, 2011, Roberts filed an amended complaint in this court. (ECF No. 8). The amended complaint contains three counts: (1) violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Maryland Fair Employment Practices Act ("FEPA") as to all Defendants; (2) violation of § 1981 and § 1983 of the Civil Rights Act as to all individual Defendants; and (3) violation of § 1981 and § 1983 as to Defendant Coffey in his official capacity.

On April 5, 2011, Defendants filed the pending motion to dismiss. (ECF No. 11). Roberts filed an opposition on May 6, 2011. (ECF No. 14). Defendants replied on May 23, 2011. (ECF No. 17). Then, on June 17, 2011, Defendants filed a motion for leave to file a supplement to the motion to dismiss. (ECF No. 18). Roberts opposed that motion on July 4, 2011. (ECF No. 19). On July 21, 2011, Defendants filed a reply to Roberts's opposition to the motion for leave. (ECF No. 20).

## II. Standard of Review

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than

a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted).

At this stage, the court must consider all well-pleaded allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, the court need not accept unsupported legal allegations. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Nor must it agree with legal conclusions couched as factual allegations, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950

(quoting Fed.R.Civ.P. 8(a)(2)).   Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### III. Analysis[7]

#### A. Defendants' Motion for Leave to File a Supplement to the Motion to Dismiss

To begin, Defendants' motion for leave to file a supplement to the motion to dismiss, which is contested by Roberts, will be denied.   Defendants filed this motion on June 17, 2011, roughly two-and-a-half months after they filed their initial motion to dismiss.   This fact alone is a sufficient basis for denying the motion.

Moreover, in that short intervening time, there were no significant proceedings, motions, or discovery that occurred to suggest that granting leave to supplement would assist the court in considering the motion to dismiss.   Indeed, Defendants do not identify any new developments in the law or in this case, which

---

[7] Defendants' motion seeks dismissal in part for lack of subject-matter jurisdiction.   (ECF No. 11, at 1).   Although Defendants' memorandum of law in support of their motion to dismiss sets forth the applicable standard of review (ECF No. 11-1, at 3-4), it does not otherwise advance any grounds for dismissing the amended complaint based on lack of subject-matter jurisdiction.   Because Roberts sets forth causes of action pursuant to Title VII, § 1983, and § 1981, his case raises a federal question.   *See* 28 U.S.C. § 1331.   Thus, the court has subject-matter jurisdiction.

may have been a legitimate reason to grant leave. *See PharMerica Chi., Inc. v. Meisels*, 772 F.Supp.2d 938, 953 n.9 (N.D.Ill. 2011) (denying a motion for leave to supplement a motion to dismiss because defendant's "new" case law relied heavily on previously cited material); *cf. Ky. Press Ass'n v. Kentucky*, 355 F.Supp.2d 853, 864-65 (E.D.Ky. 2005) (denying plaintiff's motion for leave to file supplemental opposition memorandum because plaintiff's "new" case law pre-dated the filing of the response). Rather, Defendants appear to seek leave only to present an argument that they neglected to include in their initial motion. Such an oversight is an insufficient reason to allow Defendants what is essentially a second motion. Accordingly, Defendants' motion for leave to file a supplement to the motion to dismiss will be denied.

### B. Defendant Office of the Sheriff of Charles County

Defendants argue — and Roberts concedes — that the OSCC is not a suable entity and therefore should be dismissed from this action. Indeed, the "Sheriff's Department" or the "Office of the Sheriff" is not a cognizable legal entity. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 874 (4th Cir. 1989); *Boyer v. State*, 323 Md. 558, 572 n.9 (1991). To the extent Roberts seeks redress from the OSCC as an independent entity, the OSCC is not capable of being sued. Defendants' motion to dismiss will therefore be granted as to the OSCC.

**C.   Defendant Coffey in His Official Capacity**

Defendants contend that Coffey cannot be sued in his official capacity as the Sheriff of Charles County because he is entitled to immunity under the Eleventh Amendment.  As to Count One, Roberts counters that Title VII abrogated a state's Eleventh Amendment sovereign immunity.  As to Count Three, Roberts argues that suits against state officials for injunctive relief are permitted.  Roberts is correct on both fronts.

The Eleventh Amendment bars suits in federal court for monetary damages against a state or state officials acting in their official capacity.  *Ballenger v. Owens*, 352 F.3d 842, 844–45 (4th Cir. 2003); *Lewis v. Bd. of Educ.*, 262 F.Supp.2d 608, 612 (D.Md. 2003).  It does not protect local officials.  *Harter v. Vernon*, 101 F.3d 334, 337 (4th Cir. 1996) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).  As to Title VII, however, whether Coffey is a local official or a state official is inconsequential because Title VII falls into an exception to the general rule barring suit against state officials in federal court:  Congress may validly abrogate a state's Eleventh Amendment immunity, *Seminole Tribe v. Florida*, 517 U.S. 44, 55 (1996), and it has done so with Title VII, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976).  Therefore, as

to the Title VII claims, Coffey can be sued in his official capacity.[8]

With respect to the § 1981 and § 1983 claims, the Eleventh Amendment bars suits in federal court for *monetary* damages against state officials, but it does not prohibit suits for *prospective injunctive* relief against state officials. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Here, under Count Three, Roberts seeks to have his "personnel file be purged" and to have "practices of the defendants found by the Court to be in violation of the law" be enjoined. (ECF No. 8, at 15). Because this relief appears to be directed properly towards future compliance and not compensatory relief, the Eleventh Amendment likely does not shield Coffey in his official capacity from the § 1981 or the § 1983 claims.

Roberts neglects to raise any argument in opposition to Defendants' motion with respect to the FEPA claims in Count One. This may be because on these claims, sovereign immunity likely

---

[8] The United States Court of Appeals for the Fourth Circuit has assumed, without deciding, that Title VII claims may be brought against individuals in their official capacities. *Causey v. Balog*, 162 F.3d 795, 801 n.1 (4th Cir. 1998). Generally speaking, Title VII suits may only be brought against employers, not individuals. *See Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998).

applies.   In *Pennhurst State School & Hospital v. Halderman*, 465

U.S. 89 (1984), the Supreme Court wrote:

> [A] claim that state officials violated
> state law in carrying out their official
> responsibilities is a claim against the
> State that is protected by the Eleventh
> Amendment.  We now hold that this principle
> applies as well to state-law claims brought
> into federal court under pendent
> jurisdiction.

*Id.* at 120.   In other words, where state law claims are brought

against a state official in federal court pursuant to the

federal court's supplemental jurisdiction, the Eleventh

Amendment immunizes that state official from suit.   Here, it

appears that Coffey would be considered a state official.   *See*

*Rossignol v. Voorhaar*, 321 F.Supp.2d 642, 650–51 (D.Md. 2004).

Roberts implicitly concedes as much in his opposition.  (ECF No.

15, at 4-5).   By seeking only prospective injunctive relief

against Coffey under § 1981 and § 1983, Roberts appears to have

anticipated Defendants' Eleventh Amendment argument, which

matters only if Coffey is a state official.   Accordingly, under

*Pennhurst*, Defendants' motion will be granted as to the FEPA

claims against Coffey in his official capacity.

### D.   Title VII

In the first count of his amended complaint, Roberts

asserts four claims pursuant to Title VII:   disparate

discipline, denial of training,[9] hostile work environment,[10] and retaliation.[11]    Title VII bars state governments from "discriminat[ing] against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

---

[9] Defendants characterize Roberts's claim as one of disparate treatment, and Roberts does not dispute this characterization.  The Fourth Circuit, however, has recognized a specific type of disparate treatment — denial of training — that is more applicable to Roberts's claim, so his claim will be analyzed using this framework.  *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002) (setting forth the elements of a denial of training claim); *see also Leonard v. Tenet*, No. 1:03CV1176, 2004 WL 3688406, at *4 n.2 (E.D.Va. June 30, 2004) ("Denial of training is a type of discriminatory disparate treatment claim.").

[10] The amended complaint alleges that Roberts was discriminated against in terms of "working conditions."  (ECF No. 8 ¶ 33).  Defendants characterize this allegation as a claim of a hostile work environment.  Roberts does not dispute this characterization.

[11] Roberts has alleged facts that suggest he may have also intended to bring a Title VII claim for failure to promote based on the June 2006 incident in which two junior Caucasian officers were selected to be assistant trainers instead of Roberts.  *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 319 n.6 (4th Cir. 2005) ("To demonstrate a prima facie case of racial discrimination in a failure to promote case, a plaintiff must show that:  (1) []he is a member of a protected group, (2) []he applied for the position in question, (3) []he was qualified for that position, and (4) the defendants rejected h[is] application under circumstances that give rise to an inference of unlawful discrimination.").  Neither party has presented this issue, however, as Roberts has not contested Defendants' characterizations of his claims.  Even if Roberts had advanced a claim for failure to promote, he fails to allege that he applied for the position or that he was qualified for the position, so the claim would be dismissed.

### 1.   Disparate Discipline

To state a claim of disparate discipline, a plaintiff must allege that:  (1) he is a member of a protected class; (2) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) disciplinary measures enforced against him were more severe than those enforced against other employees.  *See Settle v. Balt. Cnty.*, 34 F.Supp.2d 969, 991-92 (4th Cir. 1999) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985)).  Defendants generally attack the second and third elements of Roberts's disparate discipline claim.

Here, Roberts complains of the discipline he received as a result of the excessive force accusation against him in 2008. He specifically alleges that Irby, who is Caucasian, did not receive the same punishment — a demotion, a mandatory anger management course, and a suspension — even though Irby, too, had at one time been charged with use of excessive force.  Thus, contrary to Defendants' contentions, Roberts has stated a plausible claim for disparate discipline.  *See Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. JFM 10-CV-0206, 2010 WL 2732334, at *4 (D.Md. July 8, 2010) (noting that a plaintiff need only meet a "relatively minimal threshold" to survive a Rule 12(b)(6) motion on a disparate discipline claim); *see also Alexander v. City of Greensboro*, 762 F.Supp.2d 764, 796

(M.D.N.C. 2011) ("[P]recise equivalence in culpability between employees is not the ultimate question:  . . . an allegation that other employees involved in acts against [the employer] of comparable seriousness [were treated less severely] is adequate to plead an inferential case." (alterations in original) (citing *Moore*, 754 F.2d at 1107)).

Accordingly, Defendants' motion to dismiss will be denied as to Roberts's Title VII claim for disparate discipline.

### 2.  Denial of Training

To maintain a discriminatory denial of training claim, a plaintiff must allege that:  (1) he is a member of a protected class; (2) the employer provided training to its employees; (3) the plaintiff was eligible for the training; and (4) he was not provided training under circumstances giving rise to an inference of discrimination.  *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002).  Here, Roberts sufficiently alleges the first and second elements. Specifically as to the latter, he describes seven opportunities for training:  (1) the sixteen weeks of training with his new canine starting in December 1999; (2) the first SMCJA training in January 2007; (3) the second SMCJA training in November 2008; (4) the Blackwater Tactical School training; (5) the NADAP training; (6) the "deep hide training"; and (7) the St. Mary's County training.

As to the fourth element, however, Roberts actually pleads too many facts.  He alleges he participated in three of the seven training programs.  The denial of some training opportunities when afforded other training opportunities does not suggest discrimination.  *See Chika v. Planning Research Corp.*, 179 F.Supp.2d 575, 585 (D.Md. 2002).  But even if Roberts had limited his pleadings to only those allegations regarding the four training opportunities that he was denied, he still fails to state adequately the fourth element of a denial of training claim.[12]

Regarding the two SMJCA trainings, Roberts only avers that "similarly-situated white employees were allowed to attend the training" (*E.g.*, ECF No. 8 ¶ 17).  This type of conclusory allegation is inadequate under *Iqbal* and *Twombly* to infer discrimination.  *See Fletcher v. Philip Morris USA Inc.*, No. 3:09CV284-HEH, 2009 WL 2067807, at *6 (E.D.Va. July 14, 2009) (holding that an African-American plaintiff's allegation that "similarly situated whites, females, and non-black males" were treated differently "falls short of plausibility" with respect to a disparate treatment claim); *see also Coleman v. Md. Court*

---

[12] It is also not entirely clear that Roberts has sufficiently alleged the third element of a denial of training claim for any of these denied trainings.  Because Roberts fails to plead properly the fourth element, however, whether Roberts's eligibility for the trainings was adequately pleaded need not be determined at this time.

*of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010) (holding that an African-American plaintiff's allegation that he "was treated differently as a result of his race than whites" was too conclusory to state a disparate treatment claim), *cert. granted on other grounds*, 131 S.Ct. 3059 (June 27, 2011) (No. 10-1016).

Regarding the "deep hide training," Roberts states only that Weaver "never followed up with the request of training." (ECF No. 8 ¶ 25).  There is no indication of racially discriminatory overtones that can be gleaned from Weaver's lack of action.

Finally, regarding the Blackwater Tactical School training, Roberts only alleges that Herlihy was allowed to attend whereas he was not.  (*Id.* ¶ 23).  According to the amended complaint, however, Herlihy occupied a different position than Roberts in the OSCC, as he was one of Roberts's supervisors.  Thus, regardless of Herlihy's race — which the amended complaint fails to specify — the alleged facts do not suggest that Roberts's inability to attend the Blackwater Tactical School training was due to his race.  *See Trammell v. Balt. Gas & Elec. Co.*, 279 F.Supp.2d 646, 656 (D.Md. 2003) (holding that where African-American plaintiff's only evidence of discriminatory denial of training was that one Caucasian employee who held a different position than plaintiff received the training did not give rise to an inference of discrimination).

In sum, Roberts's Title VII claims for discriminatory denial of training must be dismissed.

### 3.  Hostile Work Environment

To state a hostile work environment claim, Roberts must allege facts that show:  "(1) unwelcome conduct; (2) that is based on the plaintiff's [race]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer."  *James v. Anne Arundel Cnty., Md.*, No. CCB-10-2267, 2011 WL 3666776, at *3 (D.Md. Aug. 19, 2011) (citing *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)).  "Courts determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2005) (internal quotations omitted).  "Pleading a hostile work environment requires both an objective and a subjective showing, specifically an environment that 'a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so.'"  *Reed v. AirTran Airways*, 531 F.Supp.2d 660, 669 (D.Md. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S.

775, 787 (1998)).   Defendants generally argue that the conduct described in the amended complaint was neither "based on race" nor "sufficiently severe or pervasive to create an abusive working environment."   (ECF No. 11-1, at 16).   They describe Roberts's assertions as mere "day-to-day dissatisfactions and annoyances." (*Id.* at 15).

Here, Roberts's theory of a hostile work environment appears to be based solely on the instances underlying his disparate discipline and denial of training claims.   (ECF No. 15, at 12).   To the extent Roberts relies on the facts behind his denial of training claim to maintain a hostile work environment claim, his allegations fail to state sufficiently that the training denials were racially motivated.   To the extent he relies on the facts behind his disparate discipline claim, his allegations fail to describe working conditions that were marked by severe or pervasive harassment.   The one isolated occurrence of Roberts being disciplined and Irby not being disciplined for ostensibly the same type of infraction does not constitute a hostile work environment.   *See Ashe v. Giant of Md., L.L.C.*, No. AW-06-1293, 2007 WL 7020451, at *4 (D.Md. July 17, 2007) (holding that allegations of isolated incidents of racially offensive conduct do not state a hostile work environment claim).

If other facts from the amended complaint unrelated to the disparate discipline and denial of training claims are considered, Roberts still does not aver sufficient facts to maintain a hostile work environment claim.  For example, Roberts complains of being called not intelligent and being incapable of properly handling his canine.  (ECF No. 8 ¶ 18).  While certainly negative, these comments carry no indicia of race-based animus.  Elsewhere, the amended complaint contains facts suggesting that Defendants did not always provide comprehensive support he needed to do his job, such as failing to provide a new canine or failing to provide his canine with veterinary care (e.g., ECF No. 8 ¶¶ 26, 28(h)), yet Roberts does not allege that these inconveniences unreasonably interfered with his work.[13]  At bottom, Roberts has not described a workplace scenario that Title VII was meant to police.  See Reed, 531 F.Supp.2d at 668 ("A hostile work environment is marked by 'extreme' conduct; 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" (quoting Faragher, 524 U.S. at 788)).

_____

[13] For example, although Roberts alleges that in September 2009, his canine partner died and Weaver failed to replace it, Roberts was able to obtain a new canine partner himself in December 2009.  (Id. ¶ 28(h)).  It is unclear why Roberts did not take this action earlier, or why he needed Weaver's authorization to do this in the first place.

Accordingly, this hostile work environment claim will be dismissed.

**4. Retaliation**

Title VII makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Protected activity of an employee, therefore, can take the form of either opposing a practice prohibited under Title VII (pursuant to the opposition clause) or making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII (pursuant to the participation clause). To allege a retaliation claim, a plaintiff must state the following elements: (1) he engaged in a protected activity, (2) his employer acted adversely against him, and (3) the protected activity was causally connected to the adverse action. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).

Here, Defendants move to dismiss Roberts's retaliation claim based on the November 2009 complaint, arguing that the amended complaint does not allege *any* of the three elements of a retaliation claim. As to the first element, Defendants'

22

contention is patently erroneous. Roberts's November 2009 complaint would be protected under the participation clause of § 2000e-3(a).

As to the second element, an employment action is considered adverse if, from an objective perspective, "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotations omitted). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Roberts identifies several specific events that took place shortly after the filing of the November 2009 complaint, four of which warrant mentioning here.

First, there was the alleged placing of the "Hurt Feelings Report" in Roberts's mailbox. The "Hurt Feelings Report" would seem to be a prime example of a "petty slight" that *Burlington* held does not constitute retaliation.

Second, Roberts's transfer to a tactical response unit could constitute an adverse action, if "the terms or conditions of [his] employment were diminished as a result of [his] transfer." *See Bailey v. Ares Grp., Inc.*, --- F.Supp.2d ---,

2011 WL 1135879, at *8 (D.Md. Mar. 25, 2011).   Here, Roberts does not allege that his transfer to the tactical response unit led to a decrease in compensation, level of responsibility, or opportunity for promotion.   Indeed, Roberts's transfer was temporary as he awaited assignment of a new canine partner, which he received in September 2010.   The amended complaint therefore does not allege adequate facts to state a retaliation claim based on this event.

Third, there was the denial of Roberts's opportunity to work an off-duty security job, which could be an adverse action. *See Reid v. Madison Cnty., Tenn.*, 173 F.3d 856, at *2 (6th Cir. 1999) (unpublished table decision); *Bazile v. City of New York*, 215 F.Supp.2d 354, 363 (S.D.N.Y. 2002).   At this time, the court need not determine whether the denial of off-duty work would constitute an adverse action because of the fourth event:   the denial of Roberts's leave request.   Such a denial, if proven true, likely constitutes an adverse employment action.   *See Allen v. Rumsfeld*, 273 F.Supp.2d 695, 706 (D.Md. 2003) (citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981)).   Therefore, Roberts has sufficiently pleaded the second element of a retaliation claim.

As to the third element, there are sufficient facts in the amended complaint that suggest a causal nexus between the filing of the November 2009 complaint and the denial of leave.   The

plaintiff's burden here is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "[T]emporal proximity between a protected activity and an adverse employment action has been found sufficient to establish a causal connection," although "a plaintiff must establish that when taking the adverse action, an employer had knowledge that the plaintiff had engaged in protected activity." *Finnegan v. Dep't of Pub. Safety & Corr. Servs.*, 184 F.Supp.2d 457, 463 (D.Md. 2002).

Here, Roberts has alleged that Herlihy placed the "Hurt Feelings Report" in his mailbox on December 3, 2009, a short time after the filing of the November 2009 complaint. Taken in the light most favorable to Roberts, this note could be circumstantial evidence that Herlihy was aware of the November 2009 complaint when he denied Roberts's request for leave a month later. This one-month span of time between Herlihy's decision to deny Roberts's leave and his learning of Roberts's protected activity is short enough to satisfy the causation element of a retaliation claim. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (holding that an employee's firing within three-and-a-half months of her engaging in protected activity was sufficient to establish the causation element).

Thus, Roberts has sufficiently stated all three elements of a retaliation claim with respect to the November 2009 complaint. The motion to dismiss Roberts's Title VII retaliation claim will be denied.

**E.   § 1981 and § 1983**

The framework that governs Title VII also governs § 1981 and § 1983 claims.   *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) ("[T]he elements required to establish such a [circumstantial] case [of discrimination] are the same under all three statutes."); *Causey v. Balog*, 929 F.Supp. 900, 913 (D.Md. 1996) ("Plaintiff's . . . failure to establish a prima facie case under Title VII . . . is fatal to his claims under §§ 1981, 1983 and 1985(3)."), *aff'd*, 162 F.3d 795 (4th Cir. 1998).   In this case, Roberts has failed to state a claim of racial discrimination based on denial of training or hostile work environment under Title VII against Defendants.   He thus fails to state § 1981 and § 1983 claims on these bases against Defendants as well.

As discussed above, Roberts has sufficiently alleged a disparate discipline claim and a retaliation claim under Title VII.   Thus, with respect to Count Three, both a disparate discipline claim and a retaliation claim against Coffey in his

official capacity under § 1981 and § 1983 may survive for present purposes.[14]

With respect to Count Two, the allegations concerning the disparate discipline claim potentially implicate all three individual Defendants.[15] The amended complaint refers to "Sheriff Coffey (acting through his agents)" as having disciplined Roberts for the incident involving excessive force. (ECF No. 8 ¶ 20). Therefore, a disparate discipline claim against all individual Defendants pursuant to § 1981 and § 1983 may proceed.

Separately, the allegations concerning retaliation implicate only Herlihy. According to the amended complaint, it was Herlihy who denied Roberts's request for leave. It was also Herlihy who allegedly denied Roberts's request to take on off-duty work. And it was Herlihy who allegedly placed the "Hurt

---

[14] Both § 1981 and § 1983 encompass retaliation claims in the employment discrimination context. *See, e.g.*, *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008) (§ 1981); *Brooks v. Arthur*, 626 F.3d 194, 198 (4th Cir. 2010) (§ 1983). The two civil rights statutes contemplate disparate discipline claims as well. *See generally Lightner v. City of Wilmington, N.C.*, 545 F.3d 260 (4th Cir. 2008).

[15] Defendants advance the rather specious argument that Roberts failed "to detail any incidents whatsoever" in Count Two to support a disparate discipline claim under the civil rights statutes. (ECF No. 11-1, at 12). Defendants forget that pleadings, such as Roberts's amended complaint here, may adopt by reference statements made elsewhere in the same pleading. *See* Fed.R.Civ.P. 10(c).

Feelings Report" in Roberts's mailbox.   Thus, a § 1981 and § 1983 retaliation claim against Herlihy — but no others — may proceed.

### F.   FEPA

In challenging Roberts's FEPA claims in Count One, Defendants focus substantial attention on the amended complaint's legal citations.   Defendants err in arguing that Roberts's claims should be dismissed because the amended complaint includes inadequate statutory citations.   To be sure, the references to state law in the amended complaint are inelegant.   The amended complaint cites Article 49B of the Maryland Code, but the relevant statute was recodified without substantive revision into Title 20 of the State Government Articles of the Maryland Code.   *See Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 610 n.2 (2010).   Even so, these problems do not justify dismissal.   "[T]he failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.   Factual allegations alone are what matters."   *Jones v. Koons Auto., Inc.*, 752 F.Supp.2d 670, 683 (D.Md. 2010); *accord Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 812 (9th Cir. 2008); *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 104 (2d Cir. 2005); *Shah v. Inter-Cont'l Hotel Chi. Operating Corp.*, 314 F.3d 278, 282 (7th Cir. 2002); *C&F Packing Co. v. IBP, Inc.*, 224 F.3d

1296, 1306 (Fed. Cir. 2000); *see also Iqbal*, 129 S.Ct. at 1950 (noting that legal conclusions only help in building the "framework of a complaint").[16]   Roberts's state law claim therefore survives Defendants' technical pleading argument.

Defendants also argue that Roberts failed to provide adequate notice to the state regarding its FEPA claim under the Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Government §§ 12-101 to -110.   Defendants' contention is untenable.   The MTCA is a wholly separate statute from the FEPA, and there is no cross-reference in either statute to the other. The FEPA's only notice requirement is set out in section 20-1013 of the State Government Article of the Maryland Code.   Section 20-1013 requires that an administrative claim be filed with the Maryland Human Relations Commission, which Roberts did.   (ECF No. 8 ¶ 7).   By its own terms, the MTCA applies only to tort actions brought under that Act.   *See Williams v. Maynard*, 359 Md. 379, 386 (2000) (construing the phrase "an action under this subtitle" in the MTCA as limiting its notice provision to actions brought pursuant to itself).   Furthermore, even if the

_____

[16] The import of Roberts's claim was clear, as evidenced by Defendants' recognition that the amended complaint's reference to Article 49B was to the state statute that was repealed on October 1, 2009.   (ECF No. 11, at 9).   Defendants ignored the fact that Article 49B was repealed only to be immediately replaced by a substantively similar statute at Md. Code Ann., State Government §§ 20-101 to -1203.

notice requirement of the MTCA were broadly applicable to all tort actions, employment discrimination is not a tort. *See, e.g.*, *Greenan v. Bd. of Educ.*, 783 F.Supp.2d 782, 791 (D.Md. Mar. 8, 2011); *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 623 (1989). Thus, no other notice to the state was required other than what Roberts already served.

Accordingly, as with the Title VII claims,[17] all of Roberts's FEPA claims except for a disparate discipline claim and a retaliation claim will be dismissed.

## IV.   Conclusion

For the foregoing reasons, the motion to dismiss the amended complaint filed by Defendants, Office of the Sheriff for Charles County, Sheriff Rex W. Coffey, Sergeant Vincent Weaver, and Lieutenant Brian Herlihy, will be granted in part and denied in part, with leave to amend. The motion for leave to file a

---

[17] Maryland courts routinely look to the Title VII context to determine the scope of liability under the FEPA. *E.g.*, *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 482 n.8 (2007) ("Title VII is the federal analog to Art. 49B of the Maryland Code. . . . [T]he statute's similarity to Article 49B in its general prohibition of discrimination in the employment context provides a useful comparison."); *see also Jarvis v. Analytical Lab. Servs., Inc.*, No. RWT 10cv154, 2011 WL 3680257, at *9 (D.Md. Aug. 19, 2011) ("The FEPA tracks Title VII's anti-retaliation provision and pursues the same objectives." (citing *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494 (1990) (reading state anti-retaliation provision "in harmony" with Title VII provision))).

supplement to the motion to dismiss filed by Defendants will be denied.  A separate order will follow.

<u>             /s/                    </u>
DEBORAH K. CHASANOW
United States District Judge